OPINION OF THE COURT
James C. Harberson, Jr., J.
The plaintiff seeks $2,000 in damages for breach of contract. The respondent claims there was no contract as a matter of fact and law. .
The plaintiff runs a security business. He was contacted by Ed Bouchard in March of 1988. He was acting as an independent contractor for the defendant’s Waterfun Theme Park. He wanted to determine if the plaintiff was interested in providing security for the park when it opened in May of 1988.
The plaintiff testified that Bouchard arranged a meeting with a Steven Africk, the manager, on May 4, 1988. When *1065 Bouchard and the plaintiff arrived at the office they were advised that Mr. Africk had become ill and another appointment was arranged on May 5, 1988 at 11:00 a.m. The plaintiff went to this meeting alone.
Mr. Africk and the plaintiff met for less than an hour. The plaintiff advised Africk of his extensive background in police and security work comprising of, among other things, over 12 years with the F.B.I. in various roles including security, as well as his extensive work in security for private business.
They discussed the number of men needed, the hours involved, the material needed and the structure of the security plan for the geography of the park. The price per hour suggested by the plaintiff was $7.50. Africk explained that he was also considering another firm who had a cheaper hourly rate.
The plaintiff countered with a $7-per-hour rate and, according to the plaintiff, Africk stood up, reached across the desk, shook the plaintiff’s hand saying, "It’s a deal.”
After this meeting concluded, Africk introduced the plaintiff to his park foreman, Dale Mallette. There had been a question about the time clocks used in the past and, according to the plaintiff, he was going to determine if they could be used on the job. The plaintiff and Mallette spent some time together discussing the keys for the time clocks, the number of locations where they would be placed for the watchman and where the keys were at that time. The plaintiff then left the park with the time clocks so he could determine if they were working properly. Mr. Mallette gave him these clocks.
The plaintiff called Lathem Time Recorder Company on May 11, 1988 to order paper dials for the time clocks and had them shipped to the park. The plaintiff also inquired about insurance coverage if he acted as courier to take the daily receipts to the bank. The job was to begin on May 18, 1988.
On May 13, 1988 Bouchard advised the plaintiff that he heard Africk had entered into a security agreement with another firm. The plaintiff called Africk on May 13, 1988 and he was advised he had been quoted a better price from another person and he had decided not to hire the plaintiff.
Mr. Africk testified that he had an extensive management background but that he had no experience with security services. He confirmed a meeting took place but that the discussions were not as detailed as the plaintiff related. He said the meeting took place on May 12, 1988 and that at the *1066 termination of the meeting no firm agreement had been reached. He also affirmed that he gave no permission to have the time clocks removed from the park and that the plaintiff had taken them without his consent.
Mr. Africk testified that he hired another firm on May 13, 1988 (the day after he consulted with the plaintiff, according to Africk’s testimony). This same day the plaintiff called Africk upon hearing from Bouchard that another person had been hired to provide security. Africk agreed that he informed the plaintiff on May 13, 1988 he did not need his services.
Mr. Africk submits as exhibit A of his lawyer’s brief (and raised the issue during cross-examination of the plaintiff) a newspaper story where the plaintiff said there had been an agreement firmed up by a handshake that was terminated before it began. The story reported:
“He charges that about a week before the security job was to begin, he and Mr. Africk shook hands after agreeing to terms, with Mr. Africk saying, 'Then it’s a deal.’
" T learned three days later, by telephone, that he decided to go with somebody else,’ Mr. Capozzella said.” (Watertown Daily Times, June 9, 1988.)
A review of the testimony and exhibits is necessary to ascertain the date these events took place and from it discern, to the extent possible, the true story.
The plaintiff says the arranged meeting occurred on May 5, 1988, while Africk says it occurred on May 12, 1988. While the actual date is in dispute, there is no question a meeting of short duration did take place between the plaintiff and Africk. The telephone bill shows the plaintiff called the Lathem Time Recorder Company on May 11, 1988 at 12:36 p.m. The invoice from the same company shows a shipment of paper dials to Waterfun Theme Park on May 16, 1988.
If the testimony of Africk is correct then why would the plaintiff call the company supplying time clock dials on May 11, 1988? This is the day before Africk even met the plaintiff and, certainly, before the plaintiff could have even seen the time clocks to determine the make of the clocks and whether the dials were needed. In other words, the plaintiff could not have called (nor would he have had any reason to call) before he secured the clocks subsequent to meeting with Africk. The court concludes that the meeting took place on May 5, 1988 and not on May 12, 1988.
The plaintiff testified in detail about the proposed security *1067 arrangements he and Africk agreed about at their meeting. Africk denies the discussion was anything more than a general review of needs and prices to meet those needs. It is the impression of the court that the plaintiffs detailed understanding of the operation of the park could have only come from a complete discussion of the whole operation in order to assess the security needs and, for that matter, the attendant cost to provide it. That is why he had knowledge of the animals, key locations, rain gear, et cetera, when he testified; that is why he examined the time clocks (and ordered the paper dials); and that is why he made additional inquiry into courier insurance if he was going to carry money to the bank under a separate agreement.
It is fair to assume if Africk had no experience with security contracts then he was either using the plaintiff to obtain information concerning what the park needed under the guise of negotiating an agreement or, once he had the plaintiff’s price, he went to the other security firm to force their price lower having the plaintiff to return to if the other firm would not reduce the cost for services. As it turned out, whatever the scenario, the plaintiff was not hired.
Exhibit A is a security service bid made by the firm the defendant hired. It is dated May 11, 1988. There is a document dated May 18, 1988, submitted as part of exhibit A which includes a security service agreement. This second document sets out information required by General Business Law § 84 and 19 NYCRR 173.1. It is interesting to note that this document is devoid of any details concerning the manner in which the services were to be carried out for the defendant by the security force. It was this detail that the plaintiff and Africk discussed at their meeting in addition to dates, hours and price. It was during this same time period that the successful firm was negotiating with Africk (May 11, 1988 to May 18,1988).
The question remains whether a contract exists under the events heretofore described.
LAW
The agreement between the plaintiff and defendant was to be completed within one year and would not be barred by General Obligations Law § 5-701 (a) (1) because it was not in writing. The obligation to provide a written statement of services and charges is imposed to an extent required by General Business Law article 7 and 19 NYCRR 173.1.
*1068 Section 173.1 (a) states: "No licensed private investigator, watch, guard or patrol agency shall undertake to perform any services on behalf of a client unless such licensee shall have delivered to the client a written statement, signed by the licensee, which shall set forth the specific service or services to be performed and the charge or fee therefor.”
The intent of the Legislature in establishing article 7 of the General Business Law as implemented by such rules and regulations deemed appropriate by the Secretary of State was to act under the police power of the State to protect the public in this area of business endeavor.
There is no question then of the obligation of the plaintiff to have complied with 19 NYCRR 173.1 (a) before he undertook an action to perform services for the respondent. The defendant’s counsel urges the court to adopt the conclusion of the Court of Appeals in Weir Metro Ambu-Service v Turner (57 NY2d 911, 912) wherein the court disallows a cause of action based on an oral agreement because it "contravened the requirement that a contract to perform services for a medical facility” be in writing (10 NYCRR 400.4 [a] [1]).
The plaintiffs counsel rejects this point comparing 10 NYCRR 400.4 (a) (1) requirement with those of 19 NYCRR 173.1. His position is that the writing required for the former must be a written contract while in the case of the latter the written statement is only a licensing requirement. The conclusion suggested is the same language that would have been used in 19 NYCRR 173.1 if a written contract was needed to have an enforceable agreement. This position is not tenable.
Article 7 of the General Business Law empowers the Secretary of State with the authority to regulate the activity of security agencies. To be licensed, the plaintiff was required to comply with such rules and regulations. 19 NYCRR 173.1 (c) requires the licensed agency, like the plaintiff, to refrain from doing any service for a client until the same was outlined in writing, delivered to the client, and: "The licensee shall obtain an acknowledgement in writing from the client of receipt of any statement of services or charges or executed agreement delivered.”
The exception to this obligation of 19 NYCRR 173.1 (a) is found at subdivision (b) of the same section: "if the client and the licensee have entered into an agreement in writing, set *1069 ting forth the services to be rendered and the fee or charge therefor”.
The statement required in subdivision (a) would only be required in addition to a written agreement, if the written agreement was silent as to limits of the service to be rendered. (19 NYCRR 173.1 [b].)
It is clear that the Secretary of State’s rules made a written contract a part of any agreement between a licensee like the plaintiff and a client like the defendant and, if the writing lacked certain specifics, 19 NYCRR 173.1 (b) provided them. Thus, while the language of 10 NYCRR 400.4 (a) (1) varied with that of 19 NYCRR 173.1 (a), (b), (c), the intent was the same — certain business relationships regulated by the State of New York must be in writing to be enforceable as a matter of public policy. Because the plaintiff failed to comply with this requirement of 19 NYCRR 173.1 (a), (b), (c) the contract he alleges between himself and the defendant is void and unenforceable by the Weir rationale.
The plaintiff argues that even if the writing required by the statute was not presented to the defendant before he learned that another company had been hired, he had the right to the claim under the contract as long as he prepared the writing before he commenced to do the job. The court disagrees.
The State of New York’s legislation in this area was to inoculate the client of the licensee against an obligation that was not first presented to him in a form outlined at 19 NYCRR 173.1. It was a condition precedent to an enforceable agreement and not, as the plaintiff would urge, a condition subsequent to be complied with after an oral agreement to terms had been negotiated — even with some part performance prior to the required document being given to the client by the licensee.
The purpose of the law and regulation is to allow the client to have in writing what he has agreed the licensee do and what the cost will be. If the client determines upon receipt of the "advance statement of services and charges” to reject it, there is no obligation to accept the agreement; and, if the client accepts it, the licensee: "shall obtain an acknowledgement in writing from the client of receipt of any statement of services or charges or executed agreement delivered.” (19 NYCRR 173.1 [c].)
*1070 If a licensee proceeds without complying with this requirement, he does so with the risk of later being without recourse if the client rejects his services. The burden by regulation rests upon the licensee and he avoids it at his peril.
It is the decision of the court that the plaintiffs request for judgment is denied, without costs.